# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | ID No. 2104011636 |
| | ) | |
| TYLER FORD, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

*Upon Consideration of Defendant's Renewed Motion for Judgment of Acquittal, Motion for a New Trial, and Additional Jury Instruction Arguments:*

### DENIED.

*SUBMITTED: March 27, 2023*
*DECIDED: April 19, 2023*

Barzilai Axelrod, Esquire, Deputy Attorney General, of THE DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, for the State of Delaware.

Joseph Hurley, Esquire, of THE LAW OFFICE OF JOSEPH A. HURLEY, Wilmington, Delaware, for Tyler Ford.

**JONES, J.**

## INTRODUCTION

On October 12, 2022, a jury convicted Tyler Ford on one count of Murder in the Second Degree, one count of Speeding, two counts of Improper Passing on the Right, and one count of Disregarding a Red Light.[1]  Mr. Ford was convicted for being the sole cause of a high-speed vehicle collision that ended horribly for him and fatally for Nathaniel Milton, Jr.

The central dispute at trial was whether Mr. Ford possessed the requisite *mens rea* to be convicted of Murder in the Second Degree.[2]  To that end, the State argued the jury could *infer* Mr. Ford possessed a culpable state of mind.  Mr. Ford asked for, and the Court denied, judgment of acquittal after the State rested.

Now, Mr. Ford has filed these timely post-trial motions to re-challenge the facts of his case in the context of Murder in the Second Degree's defined *mens rea*.  For the reasons that follow, Mr. Ford's motions must be **DENIED**.

## FACTUAL OVERVIEW

During the afternoon of October 8, 2020, Aloura Shaver witnessed two vehicles – a silver Camaro[3] operated by Kyle Fischer and a blue Saab operated by Mr. Ford – driving erratically on U.S. Route 40 towards the intersection of U.S. 40 and U.S. Route 896.  Ms. Shaver, who was stopped at a red light, noted the blue Saab was "flying" as it drove around other vehicles without a turn signal.  When the

---

[1] *See* Super. Ct. Crim. Docket, Case 2104011636, Docket Item ("D.I.") 48.
[2] The State presented evidence at trial indicating Mr. Ford was under the influence of marijuana at the time of the collision.  The jury found Mr. Ford not guilty of driving under the influence.  Accordingly, the Court will not consider any inference of Mr. Ford's impairment from marijuana when analyzing whether the State met its *mens rea* burden.
[3] At trial, Ms. Shaver called the Camaro a "Charger," a similar sports car model.

light turned green, Ms. Shaver observed the blue Saab accelerate and drive onto the left shoulder of the road to pass moving traffic as it traveled towards the intersection of LaGrange Parkway and U.S. 40.[4]

Moments later, Annet Grier, a DART paratransit bus driver traveling on U.S. 40, noticed the blue Saab and silver Camaro pass her bus on the right side. According to Ms. Grier, the vehicles moved very fast, as if they were on a racetrack, and the force of their speed caused her bus to shake when they passed her. Although she had no difficulty seeing (and slowing down for) the upcoming red light on U.S. 40, Ms. Grier testified the blue Saab moved so fast it had no time to stop. After the blue Saab passed her, Ms. Grier watched it drive through a turn-only lane at a red light and collide with a truck operated by Nathaniel Milton, Jr.

At this point, the details of the collision are uncontroverted. There were two thru-travel lanes in the direction Mr. Ford was heading, as well as a dedicated turn lane off U.S. 40 for a residential neighborhood on LaGrange Parkway.[5] Each lane was controlled by a traffic light. Mr. Milton had the right of way as he turned left out of the LaGrange Parkway neighborhood and onto U.S. 40. His vehicle exploded immediately upon impact with Mr. Ford's Saab. Mr. Ford walked away from the scene. Mr. Milton died instantly.

---

[4] According to Ms. Shaver, the silver Camaro followed close behind the blue Saab.
[5] U.S. 40 also has two traffic-signal controlled left turn only lanes onto Peach Tree Drive. *See* St. Tr. Ex. 48 (photo of W/B U.S. 40 approach to intersection).

3

Ms. Grier's DART bus was equipped with audio and video enabled cameras that captured the events before, during, and after the collision.[6] The State's accident reconstructionist, Corporal John Breen of the Delaware State Police, used the video to establish Mr. Ford was traveling between 91 to 96 miles per hour at the time of impact. Through his measurements at the scene, Corporal Breen further determined: (1) Mr. Ford would have been able to see the red light at U.S. 40 and LaGrange Parkway from 928 feet away, and (2) roadway signage alone provided Mr. Ford with 1,766.2 feet (or one-third of a mile) advanced notice of the upcoming intersection.[7]

## DISCUSSION

### a. The Renewed Motion for Judgment of Acquittal

#### I. Standard of Review

Superior Court Criminal Rule 29 governs Motions for Judgment of Acquittal.[8] The Court will grant a defendant's motion "*only* when the State presented insufficient evidence to sustain a verdict of guilt."[9] If a reasonable person could conclude from the evidence that the defendant is guilty beyond a reasonable

---

[6] *See* State's Tr. Ex. 13 (DART bus video). The State presented the certified DART video to the jury at trial. The video, which Ms. Grier testified was an accurate depiction of the events, included contemporaneous GPS data of the bus's speed, exact location, and acceleration forces. The video revealed Ms. Grier traveled at 46 miles per hour when Mr. Ford's blue Saab overtook the bus on the right. *See id.* at timestamp 16:33:33.

[7] *See* St. Tr. Ex. 48 (photo of W/B U.S. 40 approach to intersection); *see also* St. Tr. Ex. 51 (depicting signage distances on U.S. 40). Corporal Breen summarized his measurements in Figure 10 of his report as follows: the "right turn begins" sign was 379.5 feet from the intersection (Point D); the blue "LaGrange" neighborhood sign was 81.2 feet from Point D (Point C); the "traffic light ahead" warning sign posted on the north side (to Mr. Ford's right) on U.S. 40 was 234.7 feet from Point C (Point B); and the "traffic light ahead" sign to Mr. Ford's left was 142.8 feet from the intersection (Point A).

[8] Super. Ct. Crim. R. 29(a).

[9] *Vouras v. State*, 452 A.2d 1165, 1169 (Del. 1982) (emphasis added). The review of all the evidence includes all legitimately drawn inferences therefrom. The Court is to make no distinction between direct and circumstantial evidence. *Poon v. State*, 880 A.2d 236, 238 (Del. 2005). The State is not required to disprove every possible innocent explanation in circumstantial evidence cases. *Hoey v. State*, 689 A.2d 1177, 1181 (Del. 1997).

4

doubt, then the evidence is sufficient.[10] In considering the motion, the Court must view all evidence in a light most favorable to the prosecution.[11]

## II. Analysis

A finding of Murder in the Second Degree requires the jury to unanimously conclude the defendant recklessly took the life of another under circumstances manifesting a "cruel, wicked, and depraved indifference to human life."[12] Upon careful review, the Court finds the State submitted sufficient evidence from which the jury could conclude, beyond a reasonable doubt, that Mr. Ford's actions on October 8, 2020 fit within this definition. Thus, for the reasons that follow, the Court will sustain the verdict.

### i. Mr. Ford's Mens Rea

As mentioned above, the jury's deliberations probably centered on the question of whether Mr. Ford's conduct: (1) satisfied the *mens rea* for Murder in the Second Degree, or (2) was merely reckless. At trial, the State focused its case on

---

[10] *Winningham v. State,* 2023 WL 2843773, at *1 (Del. Apr. 10, 2023); see also *Monroe v. State*, 652 A.2d 560, 563 (Del. 1995) (internal citations and quotations omitted). *Monroe* builds upon the United States Supreme Court's holding in *Jackson v. Virginia*:

> This familiar standard gives full play to the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review, all of the evidence is to be considered in the light most favorable to the prosecution. The criterion, thus, impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

443 U.S. 307, 319 (1979), *reh'g denied*, 44 U.S. 890 (1979).
[11] *See Vouras*, 452 A.2d at 1169.
[12] 11 *Del. C.* § 635.

the "inferred" theory of intent, citing the Delaware Supreme Court's holding in

*Plass v. State*[13] for the proposition that:

> [T]he jury must be permitted, among other evidentiary alternatives, to infer [] the defendant intended the natural and probable consequences of his [actions]. If, on a given set of facts, such an inference is a conclusion that could be reached by a jury beyond a reasonable doubt, the evidence is sufficient [to convict]."[14]

And both parties relied heavily upon the Delaware Supreme Court's holding in

*McKinley v. State*:[15]

> To elevate Manslaughter to Murder in the Second Degree, the State must prove not only that the defendant acted recklessly as defined by 11 *Del. C.* 231(e), but must also prove [] the defendant *voluntarily and willfully did so under circumstances which demonstrate his conscious and blatant disregard for the rights and safety of others* to such a degree that death or serious injury would likely result. To do so, the State's evidence should include all the surrounding circumstances [of the defendant's conduct], including, but not limited to, the defendant's words, the degree of risk inherent in the defendant's activity, and whether he was aware of, and blatantly disregarded, a known and unjustifiable risk of death.[16]

In other words, the State reconciled *Platt* and *McKinley* to mean the jury may *infer* Mr. Ford "voluntarily and willfully" killed Mr. Milton, so long as it found the collision to be a "natural and probable consequence" of Mr. Ford's erratic driving. It is likely the jury so inferred. The Court is satisfied it had sufficient evidence to do so.

---

[13] 457 A.2d 362 (Del. 1983).
[14] *Id.* at 365; *see also* 11 *Del. C.* §§ 306, 307.
[15] 945 A.2d 1158 (Del. 2008).
[16] *Id.* at 1163-64 (emphasis added).

For one, Mr. Ford was not simply driving too fast as he inadvertently failed to heed to a red light. Instead, for over a mile, Mr. Ford intentionally traveled in a sustained pattern of dangerous and deadly driving behavior. At 91 to 96 miles per hour, Mr. Ford did not merely exceed posted safety speed limits;[17] rather, he drove through a business district on a busy afternoon in a manner that all but ensured a tragic outcome. And for at least one-third of a mile before the intersection, *every other motorist* traveling on U.S. 40 with Mr. Ford had the ability to be forewarned of, see, and ultimately yield to the red light that Mr. Ford drove through.[18]

At trial, Corporal Breen testified that the gouge mark directionality of the Saab's tires indicated Mr. Ford was moving back into a lane of travel at the moment of impact with Mr. Milton. In doing so, Mr. Ford did not account for Mr. Milton's vehicle on approach. Thus, it is difficult to find that Mr. Ford drove off the roadway at the red light with the full intention of immediately re-establishing his lane after passing the vehicles in his way.

The Court also notes the distinction between the actions of Mr. Ford and Mr. Fischer, the driver of the silver Camaro. Eyewitness testimony indicated Mr. Fischer: (1) drove in *exactly* the same dangerous manner as Mr. Ford leading to the intersection of U.S. 40 and LaGrange Parkway; (2) passed Ms. Grier's DART bus at a similar speed; (3) encountered the same cars stopped at the red light on U.S. 40

---

[17] *See* 21 *Del. C.* § 4169(b) (safe maximum limit for reasonable or prudent speeds).

[18] When Mr. Ford chose to speed, he simultaneously accepted the consequences of his actions. Specifically, Mr. Ford's driving meant: (i) he would have a faster closing distance time on other objects on the road; (ii) he would need to brake from a longer distance than other vehicles; and (iii) his elevated speed reduced the availability of collision avoidance maneuvers.

7

and LaGrange Parkway; and (4) had the same amount of time to react to the danger. But, instead of driving around the vehicles at the red light, Mr. Fischer stopped his vehicle at the thru-lane without incident.

### ii. Mr. Ford's Post-Accident Conduct

As another avenue, Mr. Ford claims his post-accident conduct reveals his pre-accident state of mind. Mr. Ford testified at trial that he: (1) called his mother to say he was in a bad crash and cried on the call;[19] (2) asked about the condition of the other driver at the hospital; (3) cried, again, when Corporal Breen informed him of Mr. Milton's death; (4) completely cooperated with police and waived *Miranda*; (5) implicated himself in the crime of smoking marijuana without a marijuana card; and (6) consented to a blood draw, despite admittedly smoking CBD earlier in the day.

In other words, Mr. Ford is apparently arguing his post-collision behavior negates the necessary *mens rea* required to sustain a verdict for Murder in the Second Degree. It does not. By testifying, Mr. Ford allowed the jury to assess his credibility.[20] And, having heard both sides, the jury unanimously agreed Mr. Ford recklessly caused Mr. Milton's death under circumstances constituting a cruel, wicked, and depraved indifference to human life. As a matter of law, the Court

---

[19] At trial, multiple eyewitnesses who spoke with, or directly observed, Mr. Ford after the collision stated he did not cry at the scene.

[20] See *Smith v. State*, 913 A.2d 1197, 1254-55 (Del. 2006). In assessing witness testimony, the jury is permitted to consider "the motives actuating the witness, the fact, if it is a fact, that the testimony has been contradicted, the witness's bias, or prejudice, or interest in the outcome of this litigation, the manner and demeanor of the witness while on the witness stand, and the apparent truthfulness of the testimony, and any and all other facts and circumstances shown by the evidence which affect the credibility of the testimony…."

8

cannot say the jury's assessment of all the evidence, including Mr. Ford's story, was wrong.

### iii.  The McKinley Argument

Third, Mr. Ford attempts to distinguish the circumstances of his case from the Delaware Supreme Court's decision in *McKinley*.[21]

In *McKinley*, the defendant led police on a high-speed car chase before running a red light and striking an innocent driver's car.[22]  The force of the collision caused the victim's car to explode, killing the driver.[23]   Affirming the jury's conviction of Murder in the Second Degree, *McKinley* remarked the defendant:

> [W]as aware of, and blatantly disregarded, a known and unjustifiable risk of death to others by his persistent pattern of egregious conduct in trying to avoid apprehension *by operating a motor vehicle at an outrageously dangerous rate of speed without any regard for multiple stop signs and red lights.*[24]

If this description of "outrageously dangerous" driving sounds familiar to the reader, that is because Mr. Ford, also, engaged in appalling conduct when he drag raced through traffic on a busy road before killing Mr. Milton.  Nevertheless, Mr. Ford attempts to differentiate his circumstances from *McKinley* on the grounds that he, unlike the defendant in *McKinley*, did not display behavior that constituted a "conscious and blatant disregard" for the safety of others.[25]

---

[21] 945 A.2d 1158.

[22] *See id.* at 1159-1160.

[23] Police in *McKinley* estimated the defendant drove in excess of 100 miles per hour at the time of the collision.

[24] *McKinley*, 945 A.2d at 1165-66 (emphasis added).

[25] Mr. Ford, specifically, argues he attempted to use his brakes before colliding with Mr. Milton.  This point was heavily disputed by the State at trial, and Mr. Ford's assertions regarding the Saab's brakes do not undercut the State's evidence.  That is so, regardless of whether: (i) the brakes worked and Mr. Ford chose not to use them; (ii) Mr. Ford attempted to use them (despite all evidence to the contrary) and they failed; or (iii) the brake failure was the result of

The Court disagrees. As noted above, at least three witnesses testified Mr. Ford drove erratically. And to the extent Mr. Ford argues he *did not* drive perilously because he attempted to brake before striking Mr. Milton, this was properly rejected by the jury. Although there was conflicting testimony, the Court must view the evidence in a light most favorable to the State.[26] Based on this evidence, rather than unsubstantiated conjecture, the jury's verdict must be sustained.[27]

### b. The Motion for a New Trial

### I. Standard of Review

Superior Court Criminal Rule 33 regulates Motions for a New Trial.[28] Pursuant to Rule 33, the Court may grant a new trial if the interests of justice require it to do so. A new trial is warranted "only if the error complained of resulted in actual prejudice, or so infringed upon the defendant's fundamental right to a fair trial as to raise a presumption of prejudice."[29]

### II. Analysis

Mr. Ford makes two arguments in support of his Motion for a New Trial. For the reasons stated below, both claims are rejected.

---

a known pre-existing and foreseeable problem Mr. Ford chose to ignore and exacerbate by driving erratically. The jury was free to factor in Mr. Ford's story of his brakes into its assessment of his *mens rea*.

[26] *See Winningham*, 2023 WL 2843773, at *1; *Vouras*, 452 A.2d at 1169.

[27] Through counsel, Mr. Ford points the Court to a number of out-of-state cases to support the proposition that his conduct did not constitute Murder in the Second Degree. The Court is unpersuaded that these cases justify overturning the jury's decision. *McKinley* is the Delaware case that most closely resembles the facts of Mr. Ford's case. And, as demonstrated, the comparison of *McKinley* and Mr. Ford's case shows the jury's finding should not be disturbed.

[28] *See* Super. Ct. Crim. R. 33. Under the rule, motions for a new trial must be made within seven days after a guilty verdict or within such further time as the Court may fix during the seven-day period.

[29] *See generally Waters v. State*, 242 A.2d 778 (Del. 2020); s*ee also State v. Milner*, 2023 WL 19080 (Del. Super. Jan. 3, 2023); *State v. Ryle*, 2015 WL 5004903, at *1 (Del. Super. Aug. 14, 2015).

### i. The Sufficiency of the Evidence

First, Mr. Ford attempts to re-litigate the sufficiency of evidence claim presented in his motion for judgment of acquittal. But, as demonstrated above, the State presented ample evidence to support the jury's verdict.

That is because Mr. Ford's convictions do not turn on the *sufficiency* of the evidence, but rather on *what the jury made of it*. And if the Court were obliged to weigh the evidence on its own, it would find the scale comes down heavily in favor of the jury's verdict.

While there were two sides to the story, the jury had more than enough evidence to conclude beyond a reasonable doubt that Mr. Ford committed Murder in the Second Degree. The interests of justice, therefore, do not support a new trial. The verdict is just and it will stand.

### ii. The "Just Plain Wrong" Argument

Mr. Ford's second argument is, in essence, a complaint that Mr. Fischer was not charged for his role in the drag race. According to Mr. Ford, Mr. Fischer's comparative lack of accountability is "just plain wrong" and mandates a new trial under Rule 33. This line of reasoning is meritless for several reasons.

First, under Rule 33, this contention requires an accompanying accusation of prosecutorial misconduct.[30] Mr. Ford has failed to argue, much less argue convincingly, that the State undertook his prosecution in bad faith.

---

[30] *See Albury v. State*, 551 A.2d 53, 62 (Del. 1988); *see also Wayte v. U.S.*, 470 U.S. 598, 607 (1985). The Court presumes Mr. Ford alleges his prosecution was "just plain wrong" because it was not undertaken in good faith and in a nondiscriminatory manner.

Second, so long as the State has probable cause to believe the accused committed an offense defined by statute, the decision of whether to prosecute rests entirely within the province of the prosecutor.[31] And even if Mr. Fischer's conduct may have exposed himself to criminal liability, the actions of "one participant in a crime [do] not automatically negate another participant's involvement."[32] So, the State's choice to prosecute Mr. Ford and not Mr. Fischer was free from error.

Lastly, Mr. Fischer and Mr. Ford behaved differently on October 8, 2020. To be sure, both drag raced through heavy traffic in a business district. But when they encountered the same red light, Mr. Fischer stopped his vehicle. Mr. Ford did not.

Thus, Mr. Ford's "just plain wrong" argument is, in itself, just plain wrong.

### c. The Jury Instruction Challenge

Unique circumstances bring Mr. Ford's final argument before the Court. Months after filing the motions discussed *supra*, Mr. Ford then filed a separate "Additional Argument, on Behalf of the Defendant, Challenging the Correctness of the Instruction on the Charge of Murder in the Second Degree" on January 23, 2023 (the "Jury Instruction Motion"), accompanied by a "Memorandum of Law in Support of a Plain Error Analysis *Vis-à-vis* the Jury Instruction Provided the Jury [sic] on the Offense of Murder in the Second Degree" (the "Jury Instruction

---

[31] *Panuski v. State*, 41 A.3d 416, 422 (Del. 2012) (internal citations omitted).
[32] *See Neal v. State*, 80 A.3d 935, 951 (Del. 2013).

Memorandum").[33]    While such filings are unusual, the Court afforded them preliminary review and directed the State to respond.  Now having considered the parties' positions, the Court will deny the additional argument for the reasons that follow.

## I.    Standard of Review
### i.  Timeliness

To begin, the Court notes Mr. Ford's additional motion is procedurally defaulted as untimely.  The motion was not filed within the assigned time set forth in Superior Court Criminal Rules 29[34] and 33.[35]  These time limits are jurisdictional, and Superior Court Criminal Rule 45(b) strictly prohibits enlargement of time for Rule 29 and 33 motions.[36]  To allow post-trial objections to jury instructions under Rule 29 would "render superfluous Rule 30's timing requirements" and, ultimately, undermine the purpose of the rule.  But, procedural bars notwithstanding, the Court will explain why his motion fails substantively, as well.

### ii.  The Plain Error Standard

As stated in Superior Court Criminal Rule 30:

> . . . No party may assign as error any portion of the [jury] charge or omission therefrom *unless that party objects thereto before or at a time set by the court immediately after the jury retires to consider its verdict*, stating distinctly the matter to which that party objects and the grounds of the objection.[37]

---

[33] D.I. 67; D.I. 69.
[34] Governing motions for Judgment of Acquittal.
[35] Governing motions for New Trial not based on newly discovered evidence.
[36] *See* Del. Super. Ct. Crim. R. 45(b); *see also State v. Bowie*, 2022 WL 4004005, at *2 (Del. Super. Sept. 1, 2022); *Maxion v. State*, 686 A.2d 148, 151 (Del. 1996).
[37] Del. Super. Ct. Crim. R. 30 (emphasis added).

Pursuant to the Rule, a defendant's failure to object constitutes a waiver of his right to raise the issue on appeal.[38] So, even assuming that Mr. Ford's claim was timely, which it is not, the Court's instructions could be reviewed, at most, only for plain error.[39]

Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process[40] and "affect[] the outcome of the trial."[41] Plain error is limited to material defects which are apparent on the face of the record.[42] These defects must be "basic, serious, and fundamental in their character, and [] clearly deprive an accused of a substantial right, or [] clearly show manifest injustice."[43]

It is settled that when this Court reviews jury instructions for plain error, "a defendant is not entitled to a particular instruction, but [] does have the unqualified right to a correct statement of the substance of the law."[44] Plain error reversal is thus appropriate "only if [the complained of] deficiency undermined the ability of the jury to intelligently perform its duty in returning a verdict."[45] The Court will review the jury instructions as a whole,[46] and only grant the defendant's

---

[38] *State v. Perkins*, 2005 WL 3007807, at *3 (Del. Super. Nov. 9, 2005) (citing *Goddard v. State*, 382 A.2d 238, 242 (Del. 1977).

[39] *See id.* (Noting that, unless the error is plain within the technical meaning of the term, this Court is not to consider a jury instruction issue the defendant failed to raise below).

[40] *Lowther v. State*, 104 A.3d 840, 845 (Del. 2014).

[41] *Hastings*, 2023 WL 150456, at *3.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Hankins v. State*, 976 A.2d 839, 842 (Del. 2009).

requested relief if it finds the instructions were not reasonably informative when judged by common practices and standards of verbal communication.[47]

## II.    Analysis

### i.    The Plain Language

As discussed above, a person is guilty of Murder in the Second Degree pursuant to 11 *Del. C.* § 635(1) when:

> The person recklessly causes the death of another person under circumstances which manifest a cruel, wicked, and depraved indifference to human life. . . .[48]

The Court accordingly charged the statutory offense in Mr. Ford's trial as:

> (1) Defendant caused a person's death;
> (2) Defendant acted recklessly in causing death; and
> (3) Defendant manifested a cruel, wicked, and depraved indifference to human life.[49]

In keeping with *State v. Waters*, the Court's instructions included both the statutory definitions relevant to the offense and the non-statutory meanings, modeled after the Superior Court's pattern jury instructions, for the words "cruel," "wicked," and "depraved."[50]

The Court also addressed *McKinley* during the jury instruction drafting process, and included the following language from *McKinley* in the instructions:

> In order to prove Murder in the Second Degree, the State must prove that Defendant voluntarily and willfully acted recklessly under circumstances which demonstrate his conscious and

---

[47] *See id.*
[48] 11 *Del. C.* § 635; *see* 11 *Del. C.* § 232 (defining elements of offense).
[49] *Jury Instr.* at 13.
[50] *Id.* at 15.

15

blatant disregard for the rights and safety of others to such a degree that death [] would likely result.[51]

Then, because two lesser-included offenses were presented, the Court charged a "Supplemental Instruction on Degrees of Homicide":

> . . . The following comments are offered to supplement those instructions and perhaps explain the differences in a more understandable way. The issue that differentiates each of the charges and defenses is the *Defendant's state of mind at the time of the offense.*
>
> *Murder Second Degree* involves a finding that the Defendant *recklessly* caused the death *under circumstances manifesting a cruel, wicked, and depraved indifference to human life.*
>
> *Manslaughter* involves a finding that the Defendant *recklessly* caused the death but does not require a finding that the Defendant manifested a cruel, wicked, and depraved indifference to human life . . . .[52]

Finally, the Court recited the following Consideration of Evidence instruction:

> If, after considering all of the evidence relating [to] any of the to the [sic] offenses, you find that the State has established beyond a reasonable doubt that the Defendant acted in such a manner to satisfy the elements of that offense as I have just stated, at or about the date and place stated in the charge, you should find the Defendant guilty of that offense . . . .[53]

The words of Murder in the Second Degree have been instructed to innumerable juries in this State over the years.[54] They were provided in this case, and have been affirmed time and time again by the Supreme Court.[55] Accordingly, the Court is

---

[51] *Id.* at 13.

[52] *Id.* at 2 (". . . you should listen to and consider *all of these instructions together* in reaching your verdict." (emphasis added)).

[53] *Id.* at 38.

[54] *Waters*, 443 A.2d at 505.

[55] *See Waters*, 443 A.2d at 503 n.5 ("1. The defendant caused the death of [another person] . . . . 1. The defendant acted recklessly . . . . 3. The defendant's recklessness was such as to manifest a cruel, wicked, and depraved

satisfied the charge in this case, *in toto*, comported with Delaware caselaw and statute.

### ii.   *Mr. Ford's Additional Language*

Nevertheless, Mr. Ford now contends it was plain error for the Court to omit an additional *fourth* component of Murder in the Second Degree.  According to Mr. Ford, the Court should have included an instruction on the overt "temporal connection between the incident (collision)" and the "cruel, wicked, and depraved indifference to human life" state of mind element.[56]

At the outset, the Court notes the Jury Instruction Motion and Jury Instruction Memorandum are inconsistent as to what elements are necessary to support Mr. Ford's plain error argument.

In the Jury Instruction Motion, Mr. Ford submits the elements for Murder in the Second Degree should have included:

(1) Causing the death of another person; and
(2) Doing so while acting with a reckless state of mind; and

---

indifference to human life."); *see also Weber v. State*, 457 A.2d 674, 687-88 (Del. 1983) ("the difference between second degree murder and manslaughter hangs on the statutory language here in question [i.e. element of "cruel, wicked, and depraved indifference to human life"]."); *Lilly v. State*, 649 A.2d 1055, 1063 (Del. 1994) ("the jury's verdict reflects its factual determination that Lilly perceived the risk of death and acted with a reckless, depraved indifference to that risk."); *Moorhead v. State*, 638 A.2d 52, 54-58 (Del. 1994) ("The nature of the risk threatened by Moorhead's conduct bore directly on whether he acted 'recklessly,' which is a statutory element of murder in the second degree."); *Chambers v. State*, 1995 WL 24887, at *1 (Del. Jan. 13, 1995) (Finding Murder in the Second Degree elements to be "First, that [the defendant] caused the death of [another person] . . . Second, the state must prove [the defendant] acted recklessly. . . . Third, in addition to the reckless conduct, the State must prove that the recklessness was of a type such as to manifest a cruel, wicked, and depraved indifference to human life."); *Berry v. State*, 2002 WL 1484510, at *3 (Del. Jul. 8, 2002) (Listing the elements of Murder in the Second Degree as: "One, defendant caused [another person]'s death . . . And two, defendant acted recklessly . . . And three, defendant's recklessness manifested a cruel, wicked, and depraved indifference to human life."); *Deshields v. State*, 879 A.2d 591, 593-94 (Del. 2005) ("Although 'reckless causation' is an element of both felony and second degree murder, to prove second degree murder, the State must show an additional element not included in the definition of felony murder, namely, that the defendant's actions indicated a 'cruel, wicked, and depraved indifference for human life."); *McKinley*, 945 A.2d at 1161 ("The words 'cruel, wicked, and depraved indifference to human life[]' are intended to define a particular state of mind . . . " that distinguishes Murder in the Second Degree from the lesser crime of Manslaughter.)
[56] *Def. Jury Instr. Mot.* at 3.

(3) Under circumstances which manifest a cruel, wicked, and depraved indifference to human life, *and the aforementioned state of mind must have been [the] defendant's state of mind when (at the time of) the reckless causation of the death of another.*[57]

But in his Jury Instruction Memorandum, Mr. Ford writes:

Rather than pontificate further by pointing out the shortcomings of the pattern, relied upon by the Court and counsel, Defense Counsel simply proposes a new model, and the distinction between the proposal and what was rendered, as the saying goes, "speaks for itself["]:

In order to find the defendant guilty of Murder in the Second Degree, you must find that the State has proven the existence of each of the following four (4) elements beyond a reasonable doubt:
(1) The defendant *drove his motor vehicle in a reckless manner* in which term I will explain momentarily; and
(2) The nature of the defendant's reckless driving was a manifestation of defendant's cruel and wicked and depraved indifference to human life; and
(3) *The recklessness and depraved indifference described occurred at or near the time of the collision so as to represent a criminal act*; and
(4) As a result of defendant's recklessness and depraved indifference to human life, he caused the death of the victim in this case.[58]

Which proposed instruction Mr. Ford intended the Court to consider is of no consequence, however, as both are inaccurate recitations of the law.

At face value, Mr. Ford's novel argument conflicts with Delaware statutory law. That is because criminal offenses are delineated by their statutory elements,[59] and Mr. Ford's four averred elements either exceed, or misinterpret, the

---

[57] *Id.* at 2 (emphasis added to highlight additions).
[58] *Def. Mem. Jury Instr.* at 22-23 (emphasis added to highlight additions).
[59] 11 *Del. C.* § 635; *see* 11 *Del. C.* § 232 (definition related to elements of offense).

law. For example, Delaware's Murder in the Second Degree statute mentions neither a motor vehicle or collision, and does not require the driving itself to be reckless.[60] The definition of "recklessly" as a state of mind is distinguishable from "reckless driving," which is a separate offense,[61] and encompasses facts and circumstances beyond the physical act of driving. Further, the phrase "so as to represent a criminal act" is prohibitively vague. To include it in the jury instructions would run contrary to the purpose of instructing juries with objective and defined elements.

As a whole, the instructions represented a correct statement of the law.[62] The Court is satisfied that the jury was able to intelligently use them in reaching its verdict.

### iii. *Juror Confusion*

Next, Mr. Ford submits the instructions caused juror confusion because they "overlooked language which would clearly explicate the duty of the jury to recognize joinder of mind and body in order that Ford be held accountable for Murder in the Second Degree."[63] In his Jury Instruction Memorandum, Mr. Ford explains:

> As presented to the jury, there was no necessary connection between recklessness as a causative factor and/or the cruelty toward humankind as a causative factor. As written, and read, it could be one of them, it could be both of them, [or] it could

---

[60] 11 *Del. C.* § 635.
[61] *See* 21 *Del. C.* § 4175.
[62] *See Hastings*, 2023 WL 150456, at *3.
[63] *Def. Jury Instr. Mem.* at 22.

be none of them in terms of causation except causing the death.[64]

This position is incorrect for a number of reasons.

First, the concept of "joinder of mind and body" is inherent to the elements of the offense as instructed. The first element of Murder in the Second Degree – Mr. Ford causing Mr. Milton's death – is the *actus reus*.[65] The second and third elements – Mr. Ford acting recklessly in causing death and manifesting a cruel, wicked, and depraved indifference to human life – define the requisite enhanced *mens rea*.[66]

Second, the instruction mandated the State to prove all three elements and the instruction's inclusion reiterated the same concept.[67]

Third, the three elements had a conjunctive "and" between the second and third elements, thereby reinforcing that *all* elements must be proven.[68]

Fourth, the included *McKinley* language elaborated that the State must prove the "[d]efendant voluntarily and willfully acted recklessly under circumstances which demonstrate his conscious and blatant disregard for the rights and safety of others to such a degree that death [] would likely result."[69]

Fifth, the Court instructed the jury on the lesser-included offense of Manslaughter. As such, the jury was informed that, under appropriate

---

[64] *Id.* at 23.
[65] *See generally* 11 *Del. C.* §§ 242 (requirements for criminal liability), 243 (voluntary act).
[66] *See generally* 11 *Del. C.* §§ 231 (definitions related to state of mind), 251-252, 263, 635.
[67] *Jury Instr.* at 13.
[68] *Id.*
[69] *Id.*

20

circumstances, it could consider a lesser charge *without* the cruel, wicked, and depraved element.[70] In providing the jury with a less dramatic alternative than the sharp choice between conviction of the offense charged and acquittal, the Court accorded Mr. Ford the full benefit of the reasonable doubt standard. And, still, the jury found him guilty of Murder in the Second Degree.

Sixth, though not required or necessary, the Court included a Supplemental Instruction on Degrees of Homicide.[71] As the name suggests, this instruction explained the differences between the associated state of mind *at the time of the offense* for each crime. The supplement reinforced, again, that Murder in the Second Degree "involves a finding that the defendant recklessly caused the death under circumstances manifesting a cruel, wicked, and depraved indifference to human life," whereas Manslaughter involved reckless causation of death but "[did] not require a finding that the Defendant manifested a cruel, wicked, and depraved indifference to human life."[72] The jury's awareness of the two charges, and its ability to juxtapose the elements of each, further demonstrates that it understood how the "cruel, wicked, and depraved" element existed in conjunction with, and as an enhancement to, the reckless *mens rea* element when it found Mr. Ford guilty of Murder in the Second Degree.

Last but not least, the Court is satisfied the jury found all three elements to have existed at the time of the offense. Factually, the collision occurred at the

---

[70] *Id.* at 14.
[71] *Id.* at 20.
[72] *Id.*

apex of Mr. Ford's recklessness, as documented by his prior 1.2 miles of uninterrupted and dangerous driving. The degree of his recklessness only *increased* as he moved towards the location of the collision. The jury found that, at some point in those 1.2 miles, Mr. Ford's recklessness manifested a "cruel, wicked, and depraved indifference to human life." Once the State had proven that element, where, *geographically*, the element arose on Mr. Ford's pre-collision joyride has no bearing on the matter; the element remained continuously in effect thereafter. So, because the element was never interrupted, extinguished, or otherwise undone, it also must have existed "at the time of the offense."

### iv. *"At the Time of the Offense" Mens Rea*

Similar to the above argument, Mr. Ford next attempts to evolve his hyper-segmented view of the evidence into an unsupported "temporal connection" *mens rea* error in the instructions.[73] Although his contention begins with the undisputed proposition that Murder in the Second Degree requires both an *actus reus* and *mens rea* "at the time of" the offense, Mr. Ford then parses the "at the time of" concept and culls from it a theory that is inconsistent with what a jury may consider in assessing a defendant's state of mind.

In other words, Mr. Ford isolates the totality of the factual circumstances into segments, analyzes the segments in a vacuum without context, and narrows his analysis to only the moment of the collision itself.[74] And, according to Mr. Ford,

---

[73] *Def. Jury Instr. Mem.* at 9.
[74] *Id.* at 6-7, 23-24.

the Court's failure to join him in doing so constitutes plain error as "there was nothing in the instruction as given that prevented the jury from commingling earlier descriptions with critical events occurring as the Ford vehicle entered the intersection."[75]

While Mr. Ford is correct that *mens rea* is limited to its existence at the time of the offense, his assertion that *the scope of facts and circumstances* used to determine *mens rea* must also be similarly restricted runs contrary to Delaware law. So, consistent with 11 *Del. C.* § 307, the Court read the jury the following "State of Mind" instruction:

> An element of the criminal offense[s] I have just defined for you deals with the state of mind of the defendant. It is, of course, difficult to know what is going on in another person's mind. Therefore, you are permitted to draw an inference, or in other words, to reach a conclusion, about a Defendant's state of mind from the facts and circumstances. In reaching this conclusion, you may consider whether a reasonable person acting in the Defendant's circumstances would have had, or would not have had, the required recklessness, criminal negligence state of mind, knowledge, or belief. Likewise, every person is inferred to intend the natural and probable consequences of his act. You should, however, keep in mind at all times that it is the Defendant's state of mind which is at issue. In order to convict the Defendant of an offense, you are required to find beyond a reasonable doubt that the Defendant, in fact, had the recklessness, criminal negligence state of mind, knowledge, or belief required for a finding of guilt.[76]

A final thing worth mentioning is that Mr. Ford testified. In doing so, he provided the jury with additional insight into his state of mind and circumstances before, and

---

[75] *Id.* at 24.
[76] Jury Instr. at 21 (emphasis added) (State of Mind).

23

at the time of, the collision. The Court, in turn, instructed the jury on "Direct and Circumstantial Evidence"[77] and "Credibility of Witnesses and Conflicts in Testimony,"[78] thereby subjecting Mr. Ford's testimony to the same credibility assessment as that of any other witness.[79]

*Actus reus* and *mens rea*, to be sure, are independent concepts, and only constitute a crime under Delaware law when they occur together. But it goes without citation that the *mens rea* can begin (and exist) before the *actus reus*. Delaware law requires proof of simultaneous occurrence, but not simultaneous creation. Thus, this argument is rejected.

### v.    *Mr. Ford's Caselaw*

Mr. Ford's final contention is nothing more than a last-ditch argument that Delaware caselaw supports his novel jury instruction theory. The Court reviews each case, and explains why he is incorrect, below.

### 1. Waters v. State

In *Waters*, the sole error the Delaware Supreme Court found in the trial court's jury instructions was the failure to define the words "cruel, wicked, and depraved indifference to human life" with their commonly accepted meanings.[80] But, as explained above, the Court *explicitly* heeded *Waters*' holding and did so here. As such, this challenge is meritless.

---

[77] *Id.* at 33.
[78] *Id.* at 35-36.
[79] *See Smith v. State*, 913 A.2d 1197, 1254-55 (Del. 2006).
[80] *Waters*, 443 A.2d at 506.

24

## 2. Berry v. State

In *Berry v. State*, a jury convicted the defendant of the lesser included charge of Manslaughter. The facts and circumstances in *Berry* included unwitnessed conduct and conflicting testimony as to causation of the victim's injuries in different locations (*e.g.*, at the defendant's home or later in his vehicle);[81] or, as Mr. Ford understands *Berry*:

> Phrased differently, the law requires the jury to ignore any conduct that was depraved, et cetera, as an antecedent to the actual conduct under examination and which is a critical distinction.[82]

This *Berry* interpretation defies both logic and the law. For one, as a threshold matter, the circumstances of Mr. Ford's case are wholly inapposite to *Berry*. Multiple eyewitnesses testified as to Mr. Ford's treacherous driving, and the cause of Mr. Milton's death was uncontroverted. Further, *Berry* does not hold that a jury must ignore antecedent conduct; instead, it encourages a "fair reading of the entire jury charge,"[83] which, in this case, included "State of Mind" and "Direct and Circumstantial Evidence" instructions to provide guidance on determining *mens rea*.

---

[81] *Berry*, 2002 WL 1484510, at *6.
[82] *Def. Jury Instr. Mem.* at 6.
[83] *Berry*, 2002 WL 1484510, at *6.

### 3. *Bullock v. State*

In *Bullock v. State*,[84] the Delaware Supreme Court analyzed 11 *Del. C.* § 263, which provides limitations to establishing the "but for" *causation* element of an offense within a *foreseeability of the risk* analysis.[85]  All told, the *Bullock* defendant was charged with Manslaughter after he drove through an intersection at nearly thirty miles per hour over the speed limit, and, while impaired by alcohol, struck another vehicle and killed its driver.[86]  The *Bullock* defendant had the right of way at the time via a yellow light and the victim had turned into the intersection against a solid red arrow.  Given the complexity of *Bullock*'s causation analysis, the Delaware Supreme Court found this Court's failure to instruct on the § 263 modification to the strict application of the "but-for" test to be reversible error.[87]  Without the § 263 charge, *Bullock* found the instructions "did not speak to the need to weigh [the defendant]'s actual awareness of the risk against the improbable actions of another actor, which unarguably contributed to the result."[88]

Here, however, there is no evidence that Mr. Milton contributed to, or created a risk of, the fatal collision.  In fact, it is undisputed that *Mr. Ford* was the sole cause of the collision that took Mr. Milton's life.  Thus, *Bullock* does not create an instruction requirement relevant to Mr. Ford.

---

[84] 775 A.2d 1043 (Del. 2001)
[85] 11 *Del. C.* § 263.
[86] *Bullock*, 775 A.2d at 1050.
[87] *Id.* at 1054.
[88] *Id.* at 1050.

## 4. Cannon v. State

In *Cannon v. State*,[89] a juvenile defendant was charged with criminally negligent homicide following a brief physical confrontation in a school bathroom. The victim, an otherwise healthy juvenile, died from an undiagnosed heart condition, and not from any actual harm incurred in the fight. The Delaware Supreme Court accordingly analyzed the facts and circumstances of the fight and how the victim actually died in the context of criminal negligence and 11 *Del. C.* § 263.

After exploring the limitations of *causation* set forth in § 263 and the issue of *foreseeability* where there is a far greater contrast between the actual and probable result in a criminal negligence context, *Cannon* held that the victim's death from cardiac arrest was simply "too remote" from the hazards of the defendant's conduct and "too accidental in its occurrence" to transform the defendant's actions from a physical attack into criminally negligent homicide.[90]

> With *Cannon* thusly framed, Mr. Ford submits:
>
> Even the Court's strongest statement – that "Death was clearly a risk of [the defendant's] conduct" – does not get us to criminal negligence. That it is possible to say, in hindsight, that death was clearly a risk of her conduct does not mean that the risk would have been clear to someone in the defendant's position who was *bound up in the moment*.
>
> . . .
>
> That language, explicitly, presupposes that the *mens rea* is inextricably linked to the time of the conduct causing the death

---

[89] 181 A.3d 615, 625-30 (Del. 2018).
[90] *Id.* at 630.

not related to cognitive processes before the conduct, nor after the conduct.[91]

In other words, this contention represents an attempt to re-engage the previously discussed motion for judgment of acquittal. While *Cannon* addresses the foreseeability of risk of death, it does not, unlike what Mr. Ford suggests, impose blanket limitations on the facts and circumstances to be considered in determining *mens rea*. Instead, the *Cannon* Court reviewed the facts and circumstances of the school fight (and not just the heart attack itself) in assessing if the requisite *mens rea* existed at the time of the offense.

### 5. *Lilly v. State*

In *Lilly v. State*,[92] the defendant drove between 75 and 80 miles per hour when he approached the curve of a concrete bridge before driving across a double-yellow line and killing the driver of an oncoming vehicle. The defendant, who was driving under the influence, had been seen drinking at a bar beforehand. Nevertheless, he argued at trial that he could not have consciously disregarded a substantial risk of death to the victim because he did not see she was there.[93] The jury rejected this hyper-segmented approach to the facts and convicted the defendant of Murder in the Second Degree, despite an available lesser included verdict option. The Delaware Supreme Court affirmed the conviction on appeal.

---

[91] *Def. Jury Instr. Mem.* at 8.
[92] *Lilly*, 649 A.2d 1055.
[93] *Id.* at 1062-63.

*6. McKinley v. State*

All roads lead back to *McKinley*. Because the Court has gone to great lengths to explain why Mr. Ford's case differs from *McKinley*, it will not entertain this final argument, other than to say it exceeds the scope of Mr. Ford's Jury Instruction Motion.[94] As *McKinley* observed:

> . . . The State's evidence *should include all the surrounding circumstances* including but not limited to, the defendant's words, *the degree of risk inherent in the defendant's activity*, and whether he was aware of and blatantly disregarded a known and unjustifiable risk of death.[95]

"The unjustifiable risk of death created by [the defendant]'s reckless actions constituted a gross deviation from a reasonable standard of conduct, in light of all the surrounding circumstances, including the purposes of his activity."[96] Mr. Ford's Motions and Additional Arguments are **DENIED.**

**IT IS SO ORDERED.**

/s/ Francis J. Jones, Jr.
Francis J. Jones, Jr., Judge

Original to Prothonotary (Criminal Division)

---

[94] *Jury. Instr. Mem.* at 10-14.
[95] *McKinley*, 945 A.2d at 1164 (emphasis added).
[96] *Id.* at 1166.